Lemen KELLY, Plaintiff,

v.

SS TYSON LYKES, her engines, tackle, furniture and apparel; and Lykes Bros. Steamship Co., Inc., Defendants.

Civ. A. No. 67–246.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 4, 1968.

Clifton S. Carl, New Orleans, La., for plaintiff.

Kaul J. M. Buhler, II, New Orleans, La., for defendants.

RUBIN, District Judge:

The plaintiff, Lemen Kelly, is a long-shoreman [1] who was loading cargo aboard the SS TYSON LYKES on March 10, 1966, when a carton containing a can of salad oil fell on his foot. He sues Lykes Bros. Steamship Company, Inc. ("Lykes"), which was his employer and the owner of the vessel, for damages

---

1. Lykes paid Kelly compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., in the amount of $760.00.

based on a claim that the vessel was unseaworthy and that he is therefore entitled to recover under the *Sieracki* rule.[2]

Lykes contends that the accident was not proximately caused by the unseaworthiness of the vessel, but resulted from the fault and want of care of Kelly or his fellow longshoremen and that Lykes is not responsible for this.

■ This defense raises a purely factual issue. On the record, the preponderance of the evidence favors Kelly and I find the facts to be as follows:

At 8:00 A.M. on the day of the accident, the crew of longshoremen that Kelly was working in began work in the No. 2 hatch. They worked until early afternoon in the No. 2 upper 'tween deck stowing cartons of salad oil. Each carton weighed 43 pounds, and measured 15 inches in height and 9¾ inches square. Around each carton were two ¼ inch metal bands to hold the sides of the carton firmly together.

The cartons of salad oil were lowered into the 'tween deck on pallet boards. Each pallet board was then placed on a wagon that was rolled to the area where the stowing was taking place. The longshoremen took the individual cartons from the wagon by hand and stacked them in solid tiers or layers. Both Kelly and his co-workers had considerable experience in the stowage of this kind of cargo. They proceeded with the work in the customary fashion.

The longshoremen "blocked out" the cargo as they worked their way from the skin of the ship. According to Kelly and Robinson, the cartons were stowed seven layers or tiers high. After the third tier a layer of dunnage was built as a foundation for the next four (4) tiers. This meant that the bottom of the top tier of cartons was not less than 92 inches, or 7 feet 8 inches, in height measuring from the deck to the top of the sixth tier.

At approximately 2:30 P.M., Kelly and co-worker Robinson were stowing the next-to-last pallet of cartons. The pallet was on a wagon approximately two feet away from the place where the cargo was to be stowed. Robinson, the plaintiff's witness, stated that he placed a carton in the seventh or uppermost tier and turned to the wagon to get another. Moments thereafter the carton that he had just placed in the stow fell and struck Kelly on the left foot. Robinson said the box looked all right when he put it up. However, the tier was over his head and the place it was stowed was too high for the longshoremen to put boxes in place correctly. Because of the height of the tier, they had to throw the boxes into place.

At no time did the longshoremen request any additional gear or equipment, and they voiced no complaints about the manner in which the work was being conducted.

There were no other witnesses to the accident. Kelly did not see the box that hit him. Lykes says it is incredible that the carton was positioned just the same as those before, that there was nothing to indicate that it might fall, and that it nonetheless fell. But it says it is equally incredible that Robinson lifted the carton to a height of at least 7 feet 8 inches and positioned it evenly upon the level upper surface of the cargo below, following which, and for no plausible reason, the carton fell.

There is no doubt the carton fell. There is no evidence that it fell in any other way than Robinson testified. And Lykes' surprise that Robinson could have lifted the cargo in the manner in which it had admittedly been handled and placed it properly and squarely atop the pile indicates that the method being used to stow the top tier was in fact unsafe. Lykes contends that the carton was never stowed, and that Robinson simply dropped it on Kelly's foot. This is, however, mere speculation. It is supported only by an interpretation Lykes seeks to

---

2. Seas Shipping Company v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

put on a statement given by Kelly two weeks after the accident in which Kelly himself speculated on the cause of the accident. It is true Kelly then said "the box couldn't fall by itself," but this is obvious. No one contends that the carton did fall by itself. The only suggestion Lykes has to offer is that it was never stowed and that Robinson either dropped it on Kelly or attempted to throw it on the seventh tier and that it then fell on Kelly. But this is mere conjecture.

Lykes' counsel urges the Court to uphold the continued viability of the doctrine of operational negligence according to the doctrine set forth in Antoine v. Lake Charles Stevedores Inc., 5 Cir., 1967, 376 F.2d 443, and suggests that this decision is not qualified by any implications arising from Mascuilli v. United States, 1967, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743, notwithstanding the interpretation put on *Mascuilli* in Candiano v. Moore-McCormack Lines, Inc., 2 Cir., 1967, 382 F.2d 961.[3] However, it is not necessary to consider in this case the extent to which *Antoine* has survived *Mascuilli*. Under the view I take of the facts, the method being used to stow these cartons overhead was unsafe, and there was a time lag between the negligent act of putting the carton that hit Kelly in place and his injury. The case therefore fits into the rule for finding shipowner's liability suggested by *Antoine* far more readily than the tottering carton fit the seventh tier in the stow of cargo. See Antoine v. Lake Charles Stevedores, Inc., supra, 376 F.2d at 445 n. 1 and 446–447. Nor do we have the situation presented in *Dugas,* supra note 3, where there was an "isolated and completely unforeseeable event" against which "the shipowner was under no duty to guard * * *." 378 F.2d at 275. It was completely foreseeable that longshoremen might not put 43 pound cartons squarely into place when they were lifting them to a height of 7 feet 8 inches.

██ The evidence satisfies me that Kelly was himself guilty of contributory negligence. He knew the method of stowing he was using, tossing the cartons overhead, was unsafe. He said he had no authority to tell the gang foreman how to do the work, and this of course is so: it is clear the gang foreman instructed at what tier dunnage was to be placed and that the cargo was to be blocked out as the men worked. However, he did not instruct the men that they could not use landing tables, or build landing tables, nor is there any explanation of the reason why Kelly and Robinson did not take additional steps for their own safety. While a majority of the fault is with the vessel, I think that, under the circumstances, the plaintiff himself contributed 25% to the accident. Therefore, the award for damages will be reduced in that amount. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 408–409, Flowers v. Savannah Machine & Foundry Co., 5 Cir., 310 F.2d 135, 138.

█ The injuries sustained by Kelly were not serious. He suffered an abrasion over the top of his left foot and an oblique fracture of the fourth metatarsal bone. He was given a shot of tetanus toxoid and his foot was placed in a cast for six weeks. Thereafter, the cast was removed and he received physiotherapy. He visited the doctor a total of 33 times; 21 of these visits were for physiotherapy. He was discharged on May 24 to resume work on May 25. He has suffered no residual disability. His medical bills have all been paid by his employer.

3. As authority, the brief cites denial of certiorari one week before *Mascuilli* in Foster v. Lykes Brothers Steamship Co., 5 Cir., 1966, 368 F.2d 326, cert. denied, 1967, 387 U.S. 908, 87 S.Ct. 1685, 18 L.Ed.2d 627; the denial of certiorari fourteen days after *Mascuilli* in Fenton v. A/S Glittre, 2 Cir., 1966, 370 F.2d 146, cert. denied, 1967, 387 U.S. 944, 87 S.Ct. 2077, 18 L.Ed.2d 1331; the denial of certiorari in *Antoine,* 1967, 389 U.S. 869, 88 S.Ct. 145, 19 L.Ed.2d 146; and the denial of certiorari in Dugas v. Nippon Yusen Kaisha, 5 Cir., 1967, 378 F.2d 271, cert. denied, 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 667; as well as the decision in Wilson v. Societa Italia de Armamento, 1968, D.C., 279 F.Supp. 945.

The following awards for damages therefore appear to be justified:

| | |
|---|---|
| 10⁷⁄ weeks wages at $115.74 = | $1,256.61 |
| Pain and suffering | 3,000.00 |
| TOTAL | $4,256.61 |

Reducing this by 25%, or $1,064.15, the total judgment for the plaintiff will be $3,192.46. The plaintiff has received $760.00 in compensation, and this must be deducted, leaving a total of $2,432.46 due the plaintiff. Biggs v. Norfolk Dredging Co., 4 Cir., 1966, 360 F.2d 360, 364; Grace Line, Inc. v. Kanton, 9 Cir., 1966, 366 F.2d 510, 511.

A form of judgment is to be prepared by the attorney for the plaintiff, and submitted to the attorney for the defendant. If they are in agreement on the form of judgment, it will be presented to the Court for signature. If they fail to agree, they are to notify the Court.